**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Case No.: 24-43233-357** |
| | ) | **Honorable Brian C. Walsh** |
| **URBAN CHESTNUT BREWING COMPANY, INC.** | ) | **Chapter 11 Proceeding** |
| | ) | |
| | ) | **Hearing Date: October 10, 2024** |
| **EIN - 27-1324055** | ) | **Hearing Time: 10:00 a.m.** |
| **Debtor.** | ) | **Location: Courtroom 5 North** |
| | ) | |
| | ) | **Spencer P. Desai, Esq.** |
| | ) | **Desai Law Firm LLC** |
| | ) | **13321 North Outer Forty Rd., Suite 300** |
| | ) | **St. Louis, Missouri 63017** |
| | ) | **(314) 666-9781** |
| | ) | **spd@desailawfirmllc.com** |

**MOTION FOR ENTRY OF ORDERS: (I) APPROVING (A) BIDDING PROCEDURES, (B) DESIGNATION OF STALKING HORSE BIDDER AND STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION AND SALE HEARING, (D) FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE HEARING; AND (E) ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM NOTICE THEREOF; AND (II) AUTHORIZING (A) SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES; (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (III) GRANTING RELATED RELIEF**

Urban Chestnut Brewing Company, Inc., the above-captioned debtor and debtor-in-possession ("***Debtor***"), by and through its proposed undersigned counsel, submits this Motion for Entry of Orders: (i) Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing; and (e) Assumption and Assignment Procedures and Form Notice Thereof; and (ii) Authorizing (a) Sale of Assets Free and Clear of All Liens, Interests, Claims, and Encumbrances; (b) Assignment of Executory Contracts and Unexpired Leases; and (iii) Granting Related Relief ("***Motion***"), states and alleges as follows:

# I. BACKGROUND

## A. Procedural Posture

1. On September 6, 2024 ("***Petition Date***"), Debtor filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code ("***Bankruptcy Code***").

2. Debtor continues in the operation and management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. No trustee, examiner or official committee has been appointed.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(2)(A), (M), (N) and (O).

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## B. Nature of Pre-Petition Date Business Operations

1. The Debtor operates a craft brewery and restaurant with two locations. The business begin in 2011, when Florian Kuplent (Brewmaster), David Wolfe, and Jon Shine opened the first facility in Midtown, St. Louis. The Debtor began brewing approximately 1200 barrels per year and employed 10 people. Currently, the Debtor brews 20,000 barrels per year and has approximately 80 employees who work in varying capacities related to brewing and hospitality. The Debtor's primary operations are in the Forest Park Southeast (The Grove) neighborhood, which the Debtor produces and packages draught beer, bottled beer, and canned beer. The Debtor also contract brews and packages beer for other breweries. Additionally, the Debtor brews and packages cold-brewed coffee for other suppliers.

7. Debtor sells its products under a variety of brand names including O-Katz (Oachkatzlschwoaf) Oktoberfest Lager, Zwickel, Zwickel Light, Schnickelfritz, Li'l Fritz, Buschelhead, Stammish, Forest Park Pilsner, STLIPA, Fantasyland, Urban Underdog American Lager, Urban Underdog Pale Ale, Dorfbier, Count Orlok, Urban Kolsch, Big Shark Grapefruit

Radler, Wally's Light Lager, O'Florians, Droppelbock, Bulleit Barrel-Aged Imperial Porter, Evolution Wheat, Old Mailbock, Pastaria Pilsner, Lemur Light Lager, Balkan Lager, Konomi Ale, Urban Seltzer: Mango Hard Seltzer, Urban Seltzer: STLIPA, Winter White Bierbrand, Pilot NA, Urban CBD, and Hop Water (the "Brands"). Each of the Brands is produced using a trade secret recipe of ingredients and processes (the "Recipes").

8. Due to economic conditions, specifically increased interest rates, plus residual effects of the pandemic, the Debtor was unable to service its secured debt with Midland States Bank. The Debtor explored various refinancing, sale and investment options to cure the payment issues with Midland States Bank and the US Small Business Administration for an EIDL loan. The Debtor and Midland States Bank reached a tentative agreement with Keg Holdings LLC to sell the Debtor's assets to Keg Holdings. After discussion of several options, the parties determined a sale pursuant to 11 U.S.C. §363 was the most expedient and beneficial option for all parties and creditors.

**C. Debtor's Pre-Petition and Post-Petition Sale and Marketing Efforts**

9. As detailed in the attached Declaration of David Wolfe, a true and accurate copy of which is attached hereto as **Exhibit A** ("***Sale Declaration***"), Debtor has determined that the best way to preserve ongoing operations, sustain employee positions, and maximize the value of Debtor's assets for Debtor's estate is through the proposed sale of Debtor's assets and operations ("***Assets***") as a going concern. Sale Declaration ¶ 9;

10. The Debtor, however, lacks the capital to sustain operations for a lengthy period of time, and business revenues are negative. To this end, the Debtor has been able to identify a buyer of its operating assets, Keg Holdings, LLC ("***Buyer***"). The Buyer has agreed to provide short term financing to the Debtor to sustain operations through completion of a sale pursuant to an Asset

Purchase Agreement ("APA") which is attached hereto and incorporated herein by this reference as **Exhibit 2**.

11. The Debtor is mindful of the need to explore potentially higher offers for the Assets. Time to do so is, however, short and the population of potential purchasers is small.

12. To initiate a satisfactory sale and marketing process for Debtor's assets ("***Sale Process***"), the Debtor proposes to circulate the Buyer's offer to a set local and regional parties in the industry . Sale Declaration ¶ 11.

13. The Debtor shall make available to any parties in interest wishing to be apprised of marketing efforts all non-confidential inquiries, offers, and correspondences with any potential purchasers to ensure that there is no indication of favoritism.

14. In order to ensure an efficient and speedy sale, the Debtor has entered into the APA attached as Exhibit 2 on the basis that Keg Holdings LLC shall serve as the proposed stalking horse purchaser for the Assets ("***Keg Holdings***" or "***Stalking Horse Bidder***"). Sale Declaration ¶ 6.

15. The Stalking Horse Bidder is not affiliated with Debtor. Upon information and belief, it was created as a special purpose entity for purposes of the proposed sale process in this case. Sale Declaration ¶ 8.

16. The negotiated terms reflected in the APA include bid protections related to being the Stalking Horse Bidder that drives the Sale Process. Sale Declaration ¶¶ 7 & 8. Debtor spent significant time and effort, pre-petition and post-petition, negotiating the APA terms with the Stalking Horse Bidder, culminating in the execution of the APA (the APA is also referenced herein as the "***Stalking Horse Agreement***"). Sale Declaration ¶ 8.

17.     Although Debtor seeks to establish a Stalking Horse Bidder, the Debtor continues its efforts to generate interest in the Sale Process and attract additional prospective buyers. Sale Declaration ¶ 11.

**D.     Material Post-Petition Developments**

18.     In tandem this Motion, the Debtor filed a motion seeking entry of the Interim Order Granting Debtor's Motion for Authorization to Obtain Secured Credit on an Interim and Final Basis ("***DIP Order***" or "***DIP Facility***").

19.     The DIP Facility, which shall be provided by Keg Holdings, will allow Debtor to continue to purchase inventory, and pay its employees, rent and utility expenses pending the contemplated sale pursuant to the Stalking Horse Agreement.  Termination of Debtor's operations would jeopardize the Sale Process, injure Debtor's creditors, both unsecured and secured, and could cost numerous employees their jobs. Sale Declaration ¶10.

20.     The DIP Facility not only contemplates the Sale Process, but also identifies specific "***Milestones***," which if not met, constitute "Events of Default" under the DIP Facility as follows—

a.      File A Motion to Approve Secured Post-Petition Financing by October 7, 2024;

b.      Obtain an Interim Order Approving Secured Post-Petition Financing by October 15, 2024;

c.      Obtain an Interim Order Approving Secured Post-Petition Financing by October 15, 2024

21.     The Stalking Horse Agreement contains Milestones which if not met, jeopardize Debtor's ability to consummate a sale for the Assets. The Milestones include:

a.      The Debtor is required to file a Motion to Sell Assets Free and Clear of Liens by October 5, 2024;

b.      Have a final hearing to approve the Sale Motion on or before December 6, 2024;

c.      Closing on the Sale of Assets by December 16, 2024.

**E. The Stalking Horse Agreement and Proposed Sale Process**

22. Debtor proposes to effectuate a sale of the Assets to the highest and best bidder, or bidders, if any materialize, by a form of asset purchase agreement (as amended from time to time, the "***Form APA***") in substantial conformity to the Stalking Horse Agreement attached hereto as **Exhibit 2**, without the proposed Stalking Horse Bid Protections (as set forth therein). The Form APA provides for, among other things, the sale of the Assets free and clear of all liens, claims, encumbrances, and other interests ("***Transaction***").

23. Debtor proposes to effectuate the Transaction via the procedures outlined in the bid procedures ("***Bid Procedures***") attached as Exhibit A to the proposed Order ("***Bid Procedures Order***") which is attached as **Exhibit 3** hereto, to determine the highest and best bidder or bidders to authorize and approve the Transaction pursuant to the form sale order attached hereto as **Exhibit 4** ("***Sale Order***").

24. Debtor seeks approval of the form and manner of notice of the Bid Procedures, the Sale Hearing (as defined below), the Objection Deadline, the respective dates, times, and places for an auction, if required under the Bid Procedures, substantially in the form attached as **Exhibit 5** ("***Transaction Notice***").

25. In connection with a Transaction, the Debtor seeks to assume and assign any known Contracts (as defined herein) that are designated by a Successful Bidder (or its designated assignee(s)), pursuant to the Assumption and Assignment Procedures (defined herein) set forth in the Bid Procedures Order, attached as Exhibit 3 hereto, and pursuant to the proposed manner of notice attached as Exhibit C to Exhibit 3 hereto.

26.     The Bid Procedures provide the Debtor with flexibility to solicit proposals, negotiate transactions, hold an auction, and proceed to consummate a potential Transaction, all while protecting the due process rights of all interested parties and ensuring a full and fair opportunity to review and consider proposed transactions. The Debtor proposes to establish the following key dates and deadlines for the sale process:

| Key Event | Deadline |
|---|---|
| Hearing to consider approval of Bid Procedures and entry of Bid Procedures Order | **October 10, 2024** |
| Deadline for the Debtor to file with the Bankruptcy Court and provide Counterparties with (i) a schedule of all executory contracts and unexpired leases, including those designated as Proposed Assumed Contracts by the Stalking Horse Bidder, (ii) notice of proposed cure costs for all executory contracts and unexpired leases, and (iii) adequate assurance information for the Stalking Horse Bidder | **October 28, 2024** |
| Deadline to object to (i) the Debtor's proposed cure costs in connection with the proposed assumption and assignment of executory contracts and unexpired leases to the Stalking Horse Bidder, (ii) the assumption and assignment of executory contracts and unexpired leases to the Stalking Horse Bidder, and (iii) adequate assurance of future performance of the Stalking Horse Bidder | **November 11, 2024** |
| Deadline to submit Bids | **November 25, 2024** |
| Deadline for the Debtor to file notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid, if no Qualified Bid is received | **November 26, 2024** |
| Deadline for the Debtor to notify Bidders of (i) status as Qualified Bidders and (ii) of selection of Baseline Bid | **November 26, 2024** |

| | |
|---|---|
| Auction (if any) to be held if the Debtor receives more than one Qualified Bid, either (i) at the offices of the Desai Law Firm, 13321 N. Outer 40 Road, Suite 300, St. Louis, MO 63017 , or (ii) virtually pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's docket prior to the Auction | **December 2, 2024** |
| Deadline for the Debtor to (i) file with the Bankruptcy Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and (ii) to the extent the Successful Bidder is not the Stalking Horse Bidder, (a) provide Counterparties with adequate assurance information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and assignment | **December 3, 2024** |
| Deadline to file objections to Transaction(s) | **December 4, 2024** |
| Deadline to reply to objections to (i) Transaction(s), (ii) cure costs, (iii) the assumption and assignment of executory contracts and unexpired leases and/or (iv) adequate assurance of future performance (if the Auction takes place) | **December 5, 2024** |
| Sale Hearing | **December 6, 2024** |

## II. RELIEF REQUESTED

27. Pursuant to sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and the United States Bankruptcy Court of Eastern District of Missouri *Chapter 11 Guidelines for Sales and Sale Procedures Motions* ("***Local Guidelines***"), the Debtor seeks entry of the Bid Procedures Order:

a. authorizing and approving the Bid Procedures substantially in the form attached as Exhibit A to the Bid Procedures Order;

b. designating and approving the Stalking Horse Bidder and approving the Stalking Horse Bid Protections (as defined herein) for the Stalking Horse Bidder, in

accordance with the terms and conditions set forth in the Stalking Horse Agreement, the Bid Procedures, and the Bid Procedures Order;

c. authorizing and scheduling the deadline for potential bidders to submit a proposal to purchase the Assets ("***Bid Deadline***"), an auction ("***Auction***") if necessary, and a hearing with respect to the approval of a proposed Transaction ("***Sale Hearing***");

d. authorizing and approving notice of the sale of the Assets, the Auction, and the Sale Hearing, substantially in the form of the Transaction Notice, attached hereto as **Exhibit 5**;

e. authorizing and approving the procedures set forth in the Bid Procedures Order ("***Assumption and Assignment Procedures***") for the assumption and assignment of the Contracts (defined herein) and the determination of the Cure Costs (defined herein); and

f. authorizing and approving the form and manner of notice to each non-Debtor counterparty (each, a "***Counterparty***") to a relevant executory contract or unexpired non-residential real property lease of the Debtor (collectively, the "***Contracts***") regarding (a) the Debtor's potential assumption and assignment of Contracts and the Debtor's calculation of the amount necessary to cure any defaults thereunder (the "***Cure Costs***"), and (b) the information supporting the Successful Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "***Adequate Assurance Information***") substantially in the form attached as Exhibit C to **Exhibit 3** hereto ("***Assumption and Assignment Notice***").

Following entry of and compliance with the Bid Procedures Order, the Debtor will seek entry of the Sale Order, substantially in the form attached hereto as **Exhibit 4,** authorizing and approving the following:

a. the sale of the Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtor and any purchaser of the St. Louis Assets, with liens, if any, to attach to the proceeds of the applicable Transaction(s);

b. the assumption and assignment of proposed assumed Contracts in connection with the Transaction(s); and

c. granting related relief.

**A. Bid Procedures**

28. As a result of the Prepetition Sale and Marketing Process conducted by the Debtor, the Debtor and its advisors believe they have adequately tested the marketplace for the purchase

of the Assets. Sale Declaration ¶ 5. As such, the Debtor intends to implement a streamlined sale and marketing process that contemplates an auction if the Debtor receives a higher or otherwise better bid than the Stalking Horse Bid. *Id*.

29. The Bid Procedures are designed to maximize value for the Assets without jeopardizing ongoing operations, and will enable the Debtor to review, analyze, and compare all bids received to determine which bid is the highest or best offer for the Assets. *Id*.

30. The Bid Procedures describe, among other things, procedures for parties to access diligence information, the way bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and approval of the ultimately successful bidder (a "***Successful Bidder***") and bid (a "***Successful Bid***"), and the deadlines with respect to the Bid Procedures. The Debtor submits that the Bid Procedures afford it the opportunity to pursue a streamlined sale process that will maximize the value of the Assets.

31. In accordance with the Local Guidelines 3(a), the material terms of the Bid Procedures are summarized below.[1]

| MATERIAL TERMS OF THE BID PROCEDURES | |
|---|---|
| Provisions Governing Qualification of Bidders and Qualified Bids<br><br>Local Guidelines 3(a)(i)-(ii) | 1. **Bid Deadline** – Deadline to submit a binding and irrevocable offer to acquire the St. Louis Assets is **November 25, at 5:00 p.m**. (prevailing Central Time) ("***Bid Deadline***").<br><br>2. **Potential Bidder Requirements** – To access the Debtor's material documents, a potential bidder ("***Potential Bidder***") must submit:<br><br>a. Confidentiality Agreement. An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor (unless such party is already a party to an existing confidentiality agreement with the Debtor that is acceptable to the Debtor for this due diligence process, in which case such agreement shall govern).<br>b. Financial Wherewithal. Sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine that |

[1] To the extent that there is any inconsistency between the terms of the Bid Procedures and the summary set forth herein, the terms of the Bid Procedures shall control.

| | |
|---|---|
| | the interested party (a) has the financial wherewithal to consummate the applicable Transaction and (b) intends to access the data room for a purpose consistent with the Bid Procedures.<br><br>3. **Qualified Bid Requirements**. The Debtor, in its reasonable judgment, will determine whether any bid qualifies as a Qualified Bid. The Stalking Horse Bid shall be a Qualified Bid. For any other bid to constitute a Qualified Bid, it must contain the following:<br><br>a. Identity of Bidder. A Qualified Bid must fully disclose, by its legal names, the identity of the Potential Bidder and each entity that will be participating in its bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Sale Transaction, and the complete terms of any such participation).<br>b. St. Louis Assets Purchased. A Qualified Bid must in the Proposed Purchase Agreement, clearly identify in writing the particular Assets the Potential Bidder seeks to acquire from the Debtor, together with a redline comparing the Proposed Purchase Agreement against the Stalking Horse Agreement.<br>c. Purchase Price; The price ("***Purchase Price***") proposed to be paid for the specified Assets in U.S. Dollars. In addition, (a) a bid must propose a Purchase Price equal to or greater than the sum of (1) the Stalking Horse Bid ($2,550,000.00), plus (2) a break-up fee ("***Break Up Fee***") of $89,000.00, plus (3) repayment of any amounts outstanding as of Closing on the DIP Facility provided by the Stalking Horse Bidder to the Debtor (estimated at approximately $300,000.00 at closing), plus (4) the initial overbid ("***Initial Overbid***"), consisting of additional cash amount such that the total Initial Overbid Amount shall be equal to a sum greater than or equal to 10.0% of the Initial Stalking Horse Purchase Price (*i.e.*, $255,000.00).<br>d. Acquired Assets. The Assets that the Potential Bidder seeks to acquire.<br>e. Excluded Assets. The Assets that the Potential Bidder does not seek to acquire.<br>f. Assumed Liabilities. The liabilities the Potential Bidder seeks to assume. For the avoidance of doubt, a Qualified Bid may include assumption of fewer than all or substantially all of Debtor's liabilities.<br>g. Excluded Liabilities. The liabilities of the Debtor that the Potential Bidder does not seek to assume.<br>h. Form of Consideration. Each bid must (a) indicate whether it is an all cash offer (including confirmation that the cash component of the bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid pursuant to section 363(k) of the Bankruptcy Code and/or the assumption of liabilities and (b) provide sufficient cash consideration specifically designated for the payment of the items set forth at paragraph "c" above.<br>i. Credit Bid. Persons or entities holding a perfected security interest in any Assets of the Debtor may, pursuant to section 363(k) of the |

| | |
|---|---|
| | Bankruptcy Code, seek to submit a "credit bid" for such Assets, to the extent permitted by applicable law, any Bankruptcy Court orders, and the documentation governing the Debtor's prepetition or post-petition secured credit facilities. A credit bid must include a commitment to provide cash consideration sufficient to pay the items set forth at paragraph "c" above, including at Closing the Break-Up Fee and DIP Repayment payable to the Stalking Horse Bidder.<br>j. Unconditional Offer/No Financial Contingencies. A commitment that the bid is formal, binding, and unconditional (except for those conditions expressly set forth in the applicable Proposed Purchase Agreement), is not subject to any further due diligence or to any financing contingency, and shall be irrevocable until the Debtor notifies such Potential Bidder that such bid has not been designated as a Successful Bid or a Back-Up Bid, or with respect to the Back-Up Bid, until the Back-Up Bid Expiration Date (as defined below).<br>k. Proof of Financial Ability to Perform. Each bid must contain such financial and other information that allows the Debtor to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's ability to perform under any contracts that are assumed and assigned to such party. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the applicable Transaction (not subject to any unreasonable conditions, in the Debtor's sole discretion), contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtor that is necessary to demonstrate that the Potential Bidder has the ability to close the applicable Sale Transaction in a timely manner.<br><br>To the extent that a bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Transaction set forth in its bid with cash on hand (or other immediately available cash), each bid must include committed financing documents that demonstrate to the Debtor's satisfaction that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its bid.<br>l. Designation of Contracts and Leases. Each bid must identify with particularity each and every executory contract and unexpired lease (collectively, the "***Contracts***"), the assumption and assignment of which is contemplated by the applicable Transaction (collectively, "***Proposed Assumed Contracts***"); |

| | |
|---|---|
| | provided, that the Proposed Purchase Agreement may allow the Potential Bidder to add and remove Contracts from the schedule of Proposed Assumed Contracts any time prior to [five (5) business days] prior to entry of an order authorizing the Transaction and may allow for certain contracts to be assumed and assigned following the closing of the Sale Transaction on substantially the terms included in the Stalking Horse Agreement. The Debtor shall provide notice to the applicable non-Debtor Contract and Lease contract counterparties (each a "***Counterparty***") of such removal and/or addition of such Counterparty's Contract and Lease as soon as reasonably practicable.<br>m. Required Approvals. A statement or evidence reflecting (i) the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals; and (ii) that the bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid or the Back-Up Bid, within a time frame acceptable to the Debtor. A Potential Bidder further agrees that its attorneys will discuss with and explain to the Debtor's attorneys such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.<br>n. Disclosure of Identity and Corporate Authorization. Each bid must (i) fully disclose, by their legal names, the identity of the Potential Bidder and each entity that will be participating in its bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Transaction), and the complete terms of any such participation, and (ii) include evidence of corporate authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if necessary, with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed Purchase Agreement in accordance with the terms of the bid and the Bidding Procedures.<br>o. Employee Obligations. Each bid must specify (i) whether the Qualified Bidder intends to hire some or all of the employees employed by the Debtor and (ii) indicate the treatment of the compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including, offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control arrangements, pension plans, retiree benefits, collective bargaining agreements, and any other employment related agreements of the Debtor (collectively, the "***Employee Obligations***").<br>p. No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts. Except for the Stalking Horse Bid, each bid must |

| | |
|---|---|
| | expressly state that the bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.<br>q. Disclosure of Connections. Each bid must fully disclose any connections or agreements with the Debtor, any other known Potential Bidder and/or any officer or director of the Debtor.<br>r. Joint Bids. The Debtor will be authorized to approve joint bids, including joint credit bids, in their reasonable discretion on a case-by-case basis.<br>s. Representations and Warranties. Each bid must include the following representations and warranties:<br>i. a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its Bid;<br>ii. a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents, as well as the Assets to be purchased and the liabilities to be assumed (as applicable), in making its bid and has not relied on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding such Assets or liabilities or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed Purchase Agreement ultimately accepted and executed by the Debtor;<br>iii. a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next highest or otherwise best bid after the Successful Bid with respect to the applicable Assets;<br>iv. a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its bid;<br>v. a statement that all proof of financial ability to consummate the applicable Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and<br>vi. a statement that the Potential Bidder agrees to be bound by the terms of these Bidding Procedures<br>t. Additional Requirements. A Potential Bidder must also accompany its bid with<br>i. a good faith cash deposit in the amount of no less than ten percent (10%) of the cash portion of the Purchase Price (a "***Deposit***"), unless otherwise agreed to by the Debtor and a Potential Bidder, which shall be deposited prior to the Bid Deadline with an escrow agent selected by the Debtor (the "***Escrow Agent***") pursuant to an escrow agreement to be entered into between the Debtor and the Escrow Agent; |

| | |
|---|---|
| | provided, however, that a Potential Bidder submitting a credit bid will not be required to accompany its bid with a Deposit for any portion of the Purchase Price that is a credit bid, but shall be required to provide a Deposit for any portion of its bid that is not a credit bid including, without limitation, the items identified in paragraph (c)(2)-(3) above; provided, further, that to the extent a Qualified Bidder increases the cash portion of the Purchase Price before, during, or after the Auction, the Debtor reserves the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the increased cash portion of the Purchase Price;<br>ii. the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wishes to discuss the bid submitted by the Potential Bidder;<br>iii. a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and<br>iv. a detailed analysis of the value of any non-cash component of the bid, if any, and back-up documentation to support such value. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br><br>Local Guidelines 3(a)(iii)(A)-(D) | 1. Purchaser Reimbursable Expenses. If the Stalking Horse Bidder terminates the Stalking Horse Agreement due to the Debtor entering into a definitive agreement with respect to a Bidder who is not the Stalking Horse Bidder, and the Debtor subsequently consummates a sale with that same Bidder, the Stalking Horse Bidder shall be entitled to the Break-Up Fee, which shall be the greater of $89,000 or the reasonable, documented actual costs and expenses incurred and paid by the Stalking Horse Bidder with respect to the Stalking Horse Bidder's negotiation and preparation of the APA, and the reasonable, documented actual costs and expenses incurred and paid by the Stalking Horse Bidder for solicitor and attorney fees.<br>2. Initial Overbid Amount. To be considered a Qualified Bid, a bid must be equal to or exceed the value of the Stalking Horse Bid, plus the sum of the items set forth at paragraph (c) above, including an additional cash amount such that the total Initial Overbid Amount shall be equal to a sum greater than or equal to 10.0% of the Initial Stalking Horse Purchase Price.<br>3. Treatment of Purchaser Reimbursable Expenses. The items described at paragraph (c)(2)-(3), above, shall be paid at the closing of an Alternative Transaction.<br>4. Credit for Payments to Midland States Bank. At Closing on any Transaction with the Stalking Horse Bidder, the Stalking Horse Bidder shall credit as against any cash to be paid at Closing a sum equal to seventy five percent (75%) of all payments made to Midland States Bank by the Debtor as adequate protection or otherwise during the course of the within bankruptcy proceedings ("***Stalking Horse DIP Credit***"). |

| | |
|---|---|
| **Modification of Bidding and Auction Procedures**<br><br>**Local Guidelines 3(a)(iii)(E)** | 1. The Debtor may extend the Bid Deadline for all or certain Potential Bidders, without further order of the Bankruptcy Court.<br>2. The Auction may be held virtually pursuant to procedures filed by the Debtor on the Bankruptcy Court's docket or may be held at another time and date as may be determined by the Debtor.<br>3. The Debtor reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid and to clarify or otherwise improve such bid that it may be designated a Qualified Bid.<br>4. The Debtor reserves the right to and may increase or decrease the Minimum Overbid Amount at any time during the Auction.<br>5. The Debtor may, in the exercise of its reasonable business judgment, adopt rules for the Auction consistent with the Bid Procedures and the Bid Procedures Order that the Debtor reasonably determines to be appropriate to promote a competitive Auction.<br>6. At the Auction, the Debtor, in its reasonable business judgment will be permitted to request best and final offers from the Qualified Bidders (including the Stalking Horse Bidder).<br>7. Provided the same shall not cause a default relating either to the DIP Facility or the Stalking Horse Agreement (or if such defaults are waived, in writing, by Keg Holdings), the Sale Hearing may be adjourned or continued to a later date by the Debtor by sending notice prior to or making an announcement at the Sale Hearing. No further notice of any such adjournment or continuance will be required to be provided to any party.<br>8. The Debtor may extend the applicable Sale Objection deadline, as the Debtor deems appropriate in the exercise of its reasonable business judgment. |
| **Closing with Alternative Backup Bidders**<br><br>**Local Guidelines 3(a)(iii)(F)** | 1. The Debtor may identify which Qualified Bid(s) constitute the second highest or otherwise best bid(s) and deem each such bid(s) a Back-Up Bid.<br>2. Back-Up Bid(s) shall remain open and irrevocable until the earliest to occur of (such date, the "***Back-Up Bid Expiration Date***"):<br>a. applicable outside date for consummation of the Transaction set forth in the Back-Up Bid;<br>b. consummation of a Transaction with a Successful Bidder; and<br>c. release of such Back-Up Bid by the Debtor in writing.<br>3. If a Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid. |
| **Provisions Governing the Auction**<br><br>**Local Guidelines 3(b)** | 1. If the Debtor does not receive any Qualified Bids (other than the Stalking Horse Bid,) for any of the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will not conduct the Auction and shall file a notice with the Bankruptcy Court by **November 26 at 5:00 pm (prevailing Central Time)** indicating that the no Auction will be held and designating the Stalking Horse Bid as the Successful Bid and the Stalking Horse Bidder as the Successful Bidder.<br>2. If the Debtor receives more than one Qualified Bid for any Asset (including the Stalking Horse Bid), the Debtor will conduct the Auction on **December 2, at 11 a.m. (prevailing Central Time)** (i) at the offices of The Desai Law Firm, 13321 N. Outer Forty Road, St. Louis, Missouri 63017, (ii) virtually pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's |

| | |
|---|---|
| | docket prior to the Auction, or (iii) at such other date or location as may be determined by the Debtor.<br><br>**Participants and Attendees at Auction**:<br>1. Only Qualified Bidders are eligible to participate in the Auction.<br>2. Professionals and/or other representatives of the Debtor and Qualified Bidders shall be permitted to attend and observe the Auction.<br>3. Any creditor of the Debtor may attend and observe the Auction; provided, that such creditor provides the Debtor with written notice of its intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice shall be sent to the proposed attorneys for the Debtor via electronic mail.<br><br>**Auction Procedures**:<br>1. Open Auction. The Auction, if any, will be conducted openly and shall be transcribed or recorded.<br>2. Baseline Bids. Bidding for the Assets will start with the highest or otherwise best offer received, as determined by the Debtor in its sole discretion.<br>3. Minimum Overbid. Bidding shall begin in the amount of the Initial Overbid Amount. The Debtor has the right to increase or decrease the Minimum Overbid Amount thereafter at any time during the Auction.<br>4. No Collusion: Each Potential Bidder must confirm in writing and on the record that it has not engaged in any collusion and that its Bid represents a binding, good faith, bona fide offer.<br>5. Disclosure of Bids. All material terms of each Qualified Bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders.<br>6. Confidentiality. All parties attending the Auction must keep the proceedings and results of the Auction confidential until the Debtor has closed the Auction; provided, that parties may speak with clients or parties necessary to place their bid or increase it so long as such individuals are advised of the confidentiality restrictions provided hereunder and in the confidentiality agreements. |

32. The Debtor believes that the time periods set forth in the Bid Procedures are reasonable and appropriate under the circumstances presented in this case. The Debtor's business has been reasonably, if informally, marketed to strategic and other investors in recent months and information regarding the Debtor's business remains available to potential bidders. Parties that may have an interest in bidding at the Auction likely already have been contacted and have evaluated the Debtor's business and have indicated generally a lack of interest in the Assets, but if they reconsider, they will not be bidding in a vacuum. Potential bidders that have not previously

conducted diligence on the Debtor's business will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a substantial body of information regarding the Debtor's Assets.

33. In addition, the timeline proposed considers that an efficient timeline will minimize administrative expenses and maximize recoveries ultimately available for unsecured creditors without threatening a cessation of the Debtor's ongoing operations.

**B. Stalking Horse Agreement**

34. Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder is purchasing substantially all of the Assets and assuming certain liabilities, as well as certain executory contracts and unexpired leases (collectively, "***Proposed Assumed Contracts***").

35. The Stalking Horse Agreement Break-Up Fee is a reasonable estimate of the costs to be incurred by the Stalking Horse in bringing a Transaction to fruition, including assistance if preparation of various motions and orders submitted to the Court for purposes of creating an opportunity for other potential bidders to participate in an Auction. The Stalking Horse Agreement provides for the payment of the estimated actual, documented, and reasonable out-of-pocket costs and expenses that are incurred by the Stalking Horse Bidder in connection with the negotiation, documentation, execution, and performance of the Stalking Horse Agreement, the Transaction, and all proceedings incident thereto ("***Purchaser Reimbursable Expenses***").

36. The Purchaser Reimbursable Expenses are payable to Keg Holdings at the closing of an Alternative Transaction. If, for some reason, the Purchaser Reimbursable Expenses are not paid at the closing of an Alternative Transaction, the Purchaser Reimbursable Expenses will be deemed a super-priority administrative expense, with priority over all other administrative expenses, other than the DIP Facility, in the event that the Stalking Horse Agreement is terminated

by the Stalking Horse Bidder as a result of a material breach by the Debtor or the Debtor enters into a definitive agreement with respect to a Bidder that is not the Stalking Horse Bidder, and in each case, the Debtor subsequently consummates a sale with another bidder.

37. The Bid Procedures also provide for initial overbid minimum and subsequent bidding increment requirements for bids submitted for the Assets (the Purchaser Reimbursable Expenses and the other bid protections described in this paragraph collectively are referred to as the "***Stalking Horse Bid Protections***"). In the event the Auction is held and the Stalking Horse Bidder is not the winning bidder, the Stalking Horse Bidder has agreed to act as a "Back-Up Bidder" and, as such, may hold open its binding offer to purchase the St. Louis Assets for a period of time after the Auction in the event the winning bid at the Auction is not consummated.

38. In accordance with the Local Guideline 2(c), the chart below summarizes the significant terms of the Stalking Horse Agreement:

| **Material Terms of the Stalking Horse Agreement** | |
|---|---|
| **Stalking Horse Agreement Provision** | **Summary Description** |
| **Purchase Price** | Equal to the sum of: (a) Two Million Five Hundred and Fifty Thousand Dollars ($2,550,000); minus (b) Stalking Horse DIP Credit as of the Closing date.<br><br>*See* Stalking Horse Agreement § 1.04 |
| **Purchased Assets** | Substantially all the assets and operations of the Debtor related to the business of the Debtor.<br><br>*See* Stalking Horse Agreement §1.01 |
| **Assumed Liabilities** | 1. Liabilities arising under the terms of each Purchased Contract, solely to the extent arising after the Closing Date, but excluding any Liabilities arising out of or related to any breach or default thereof occurring at or prior to the Closing or arising out of any event or circumstance occurring at or prior to the Closing which, with the delivery of notice, lapse of time or both, would constitute a breach or default thereof;<br><br>2. all Liabilities set forth on Section 1.03(a)(iii) of Seller's Disclosure Schedule<br><br>*See* Stalking Horse Agreement § 1.03 |
| **Sale to Insider** | The Transaction is not to an insider. |

| | |
|---|---|
| Local Guidelines 2(c)(i) | |
| **Agreements with Management** Local Guidelines 2(c)(ii) | There are anticipated to be agreements with management personnel. Keg Holdings is not presently a participant in the Debtor's industry. The experience and assistance of current employees and management will be required to sustain operations. |
| **Releases** Local Guidelines 2(c)(iv) | Customary release documentation evidencing the release and termination of all Claims and Liens, if any, associated with all indebtedness owed by Seller to a secured lender with respect to the Assets.<br><br>*See* Stalking Horse Agreement § 1.01 |
| **Private Sale/No Competitive Bidding** Local Guidelines 2(c)(iv) | The Stalking Horse Agreement is subject to better or otherwise higher bids at an auction.<br><br>*See* Stalking Horse Agreement § 2.01 |
| **Closing and Other Deadlines** Local Guidelines 2(c)(v) | The outside date for closing is December 16, 2024, subject to extension by written mutual consent of Debtor and the Stalking Horse Bidder<br><br>*See* Stalking Horse Agreement §2.01(a) |
| **Good Faith Deposit** Local Guidelines 2(c)(vi) | Immediately upon interim Court approval, the Stalking Horse Bidder shall pay a deposit of $255,000.00 to the Escrow Agent.<br><br>The deposit will be (a) applied to the purchase price if the closing occurs, (b) released to the Debtor if the Debtor terminates the Stalking Horse Agreement for the Stalking Horse Bidder's breach or (c) returned to the Stalking Horse Bidder if the Stalking Horse Agreement is terminated for any reason other than by Debtor for the Stalking Horse Bidder's breach. |
| **Interim Arrangements with Stalking Horse Bidder** Local Guidelines 2(c)(vii) | As DIP lender, there are customary interim financing arrangements with the Stalking Horse Bidder. |
| **Use of Proceeds** Local Guidelines 2(c)(vii) | Promptly following the Closing, the cash proceeds of the sale shall be paid by the Debtor as follows: (a) Debtor shall pay to Midland States Bank the sum of $2,550,000.00, (b) the Successful Bidder shall pay to the Stalking Horse Bidder the Break-Up Fee and fully pay and satisfy the DIP Facility provided to the Debtor by the Stalking Horse during the course of the within bankruptcy proceedings; (c) retain the resulting net sale proceeds of the sale of the Assets pending further order of the Court. |
| **Tax Exemption** Local Guidelines 2(c)(ix) | Presently under the circumstances, exemption pursuant to 11 U.S.C. Section 1146(a) is not sought under the expectation that the sale will close prior to the confirmation of the Debtor's chapter 11 plan. |

| | |
|---|---|
| **Record Retention** Local Guidelines 2(c)(x) | The books and records and related documentation remaining with the Debtor include all books and records concerning the Excluded Assets and Retained Liabilities, which includes those required by Debtor in connection with administering the Case |
| **Sale of Avoidance Actions** Local Guidelines 2(c)(xi) | Avoidance Actions are Excluded Assets. |
| **Requested Findings as to Successor Liability** Local Guidelines 2(c)(xii) | The Stalking Horse Agreement proposes a sale free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement.<br><br>The proposed Sale Order provides that all Purchased Assets are being sold free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement. |
| **Sale Free and Clear of Unexpired Leases** Local Guidelines 2(c)(xiii) | The Stalking Horse Agreement proposes a sale free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement.<br><br>The proposed Sale Order provides that all Purchased Assets are being sold free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement. |
| **Credit Bid** Local Guidelines 2(c)(xiv) | Stalking Horse Bidder is authorized to "credit bid" the net value Stalking Horse DIP Credit. |
| **Relief from Bankruptcy Rule 6004(h)** Local Guidelines 2(c)(xv) | Relief from Bankruptcy Rule 6004(h) is sought<br><br>Sale Order ¶ 47. |

### C. Noticing Procedure

39. The Bid Procedures and Bid Procedures Order provide for procedures regarding noticing (the "***Noticing Procedures***"), including:

**a.** **Sale Notice**. As soon as practicable, but no later than three (3) business days after entry of the Bid Procedures Order, the Debtor will file with the

Bankruptcy Court, serve the Sale Notice which will set forth (i) a description of the Assets for sale; (ii) the date, time, and place of the (A) Auction and (B) Sale Hearing; and (iii) the deadlines and procedures for objecting to the proposed Transaction(s).

**b.** **Deadline to Cancel the Auction**: If no Qualified Bid is received, the Debtor shall file a notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid by no later than **November 26, at 5:00 p.m. (prevailing Central Time)**.

**c.** **Selection of Qualified Bids**. The Debtor will notify Bidders of (i) status as a Qualified Bidder and (ii) selection of Baseline Bid by no later than **November 25, 2024 5:00 p.m. (prevailing Central Time)**; provided, that the Debtor shall have the right to extend the Bid Deadline for any reason whatsoever, in its reasonable business judgment, for all or certain Potential Bidders (as defined in the Bidding Procedures), without further order of the Court.

**d.** **Notice of Auction Results**. The Debtor shall file with the Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and, to the extent the Successful Bidder is not the Stalking Horse Bidder (a) provide Counterparties with Adequate Assurance Information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and assignment by no later than **December 3, 2024 5:00 p.m. (prevailing Central Time)**.

40. The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the deadline to object to the proposed Transaction(s), the Bid Deadline, and the date, time and location of the Auction, and Sale Hearing. Accordingly, the Debtor requests that the Bankruptcy Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rules 2002 and 6004 and Local Rule 2002-1.

**D. Need for a Timely Sale Process**

41. The Debtor believes that the time periods set forth in the Bid Procedures are reasonable and will provide parties with sufficient time and information to submit a bid for the Assets. In formulating the Bid Procedures and time periods set forth therein, the Debtor balanced

(i) on the one hand, the need to provide adequate and appropriate notice to parties in interest and potential bidders to ensure due process and a competitive bidding process that will maximize sale proceeds and (ii) on the other hand, the need to run a quick and efficient sale process to avoid administrative expenses that will decrease the realizable value available to creditors and prevent an interruption of the Debtor's business operations. To that end, the Bid Procedures are designed to encourage prospective bidders to submit bids to provide the highest or otherwise best available recoveries to the Debtor's stakeholders.

42. The Debtor's formulation of the Bid Procedures was also informed by (i) the efforts pre-petition to identify a buyer for the Assets; and (ii) the fact that likely interested bidders have been solicited. Furthermore, potential bidders have had, and, in accordance with the Bid Procedures, will continue to have access to comprehensive information including information gathered based upon specific due diligence requests of the Stalking Horse Bid and other prepetition potential bidders.

43. A timely sale process is also necessary because of the Milestones.

44. Failure to adhere to the time periods set forth in the Bid Procedures and the Milestones could jeopardize the closing of the Transaction, which the Debtor believes is the best means of maximizing the value of the Assets, maintaining the business as a going concern, and minimizing claims against the Debtor's estate. In light of the foregoing, the Debtor has determined that pursuing the Transaction in the manner and with the procedures proposed is in the best interests of the Debtor's estate and provides interested parties with sufficient opportunity to participate.

**E. Assumption and Assignment Procedures**

45.     In connection with a Transaction, the Debtor seeks to assume and assign any known Contracts that are designated by a Successful Bidder (or its designated assignee(s)). The Assumption and Assignment Procedures set forth in the Bid Procedures Order are designed, among other things, to provide notice of the assumption/assignment and Cure Costs to relevant Counterparties and govern the Debtor's provision of Adequate Assurance Information (as defined herein).

46.     The Debtor submits that the Assumption and Assignment Procedures as set forth in the Bid Procedures Order are reasonable and appropriate—they are fair to all non-Debtor Counterparties and comply in all respects with the Bankruptcy Code. The Debtor requests that the Assumption and Assignment Procedures be approved.

47.     As illustrated in the Bid Procedures, the Debtor will serve the Assumption and Assignment Notice on all Counterparties regarding the proposed assumption and assignment Proposed Assumed Contracts. The Assumption and Assignment Notice will identify the Debtor's calculation of any Cure Costs payable if the Debtor ultimately assumes and assigns such Contracts. Each Counterparty will then have ample time to object to the Debtor's calculation of such Cure Costs.

Further, as set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid" a Potential Bidder must include with its bid proof of its financial ability to perform (and the ability of its designated assignee, if applicable) in satisfaction of the requirements under section 365(f)(2)(B) with respect to any Contracts to be assumed and assigned ("***Adequate Assurance Information***"). Upon request, the Debtor will make available the Adequate Assurance Information to all Counterparties to the Proposed Assumed Contracts and such Counterparties will have an

opportunity to file an objection in advance of the Sale Hearing as set forth in the Assumption and Assignment Procedures.

## III. RELIEF REQUESTED IS WARRANTED AND IN BEST INTEREST OF THE DEBTOR AND STAKEHOLDERS

### A. The Bid Procedures are Fair and Reasonable.

48. The Bid Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's assets—maximizing the value of sale proceeds received by the estate. *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value); *Wintz v. American Freightways, Inc. (In re Wintz Companies)*, 219 F.3d 807, 812-813 (8th Cir. 2000) (sale procedure providing for competitive bidding calculated to maximize value to the estate was deemed valid); *Burtch v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor had fiduciary duty to maximize and protect value of estate's assets). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

49. The Bid Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Assets. The Debtor has structured the Bid Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Assets. Additionally, the Bid

Procedures will allow the Debtor to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Transaction. Moreover, entry into the Stalking Horse Agreement ensures that the Debtor will obtain fair market value for the Assets more than double estimated liquidation values that could result if operations were impaired by setting a minimum price for the Assets. As such, the Debtor and its creditors can be assured that the consideration obtained will be fair and reasonable.

50.    Courts in this and other districts have approved procedures substantially similar to the proposed Bid Procedures. *See, e.g. In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr. E.D. Mo. August 19, 2020) [Docket No. 505]; *In re Peabody Energy Corporation*, 1642529 (BSS) (Bankr. E.D. Mo. Jan. 12, 2017) [Docket No. 1964]; *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161 (KSS) (Bankr. E.D. Mo. June 12, 2016) [Docket No. 378]; *see also In re Bumble Bee Parent, Inc.*, Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) [Docket No. 171]; *In re Fusion Connect, Inc.*, Case No. 19-11811 (SMB) (Bankr. S.D.N.Y. July 3, 2019) [Docket No. 164]; *In re Southcross Energy Partners, L.P.*, Case No. 19-10702 (MFW) (Bankr. D. Del. Jun. 13, 2019) [Docket No. 324]; *In re Ditech Holding Corp.,* Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) [Docket No. 456]; *In re Waypoint Leasing Holdings Ltd.*, Case No. 18-13648 (SMB) (Bankr. S.D.N.Y. Dec. 21, 2018) [Docket No. 159]; *In re Sears Holdings Corp.,* Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 19, 2018) [Docket No. 816]; *In re Color Spot Holdings, Inc.*, Case No. 18-11272 (LSS) (Bankr. D. Del. Jun. 25, 2018) [Docket No. 134]. Accordingly, the Bid Procedures should be approved.

**B.    Stalking Horse Bid Protections are Reasonable and Appropriate**

51.     The Bid Procedures contain certain Stalking Horse Bid Protections for the Stalking Horse Bidder, such as the Initial Overbid and the Break-Up Fee which approximates actual out of pocket costs of the Stalking Horse, and the Stalking Horse DIP Repayment. Bid incentives such as these are necessary to incentivize a bidder to provide a floor price for the Debtor's assets based on the bidder's due diligence and investigation pre-auction, which forms the basis for other potential bidders to come in and potentially overbid. Bidding incentives such as these Stalking Horse Bid Protections are commonplace in connection with sales under section 363 of the Bankruptcy Code. Approval of these protections in connection with a sale of assets has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. *See, e.g.*, *In re Armstrong Energy, Inc.*, No. 17-47541 (KAS) (Bankr. E.D. Mo. Dec. 1, 2017) [Docket No. 208] (no break-up fees were requested and court approved expense reimbursement in an amount not exceeding $1 million); *In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr. E.D. Mo. August 19, 2020) [Docket No. 505] (approving break-up fee and reimbursement fee of $19,250,000); *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Jan. 30, 2017) [Docket No. 2262] (approving a break-up fee of $200,000 and expense reimbursement in an amount not exceeding $150,000); *In re Noranda Aluminum, Inc.*, No. 16-10083 (BSS) (Bankr. E.D. Mo. Oct. 19, 2016) [Docket No. 1306] (approving a break-up fee of $645,000 and expense reimbursement in the amount of $1 million); *In re Noranda Aluminum, Inc.*, No. 16-10083 (BSS) (Bankr. E.D. Mo. June 23, 2016) [Docket No. 898] (approving a break-up fee of $4.32 million, which is 1.5% of the cash purchase price, and expense reimbursement in an amount not exceeding $1.5 million); *In re Total Hockey, Inc.*, No. 16-44815 (CER) (Bankr. E.D. Mo. July 11, 2016)

[Docket No. 78] (approving a breakup fee of $250,000); *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161 (KAS) (Bankr. E.D. Mo. June 15, 2016) [Docket No. 399] (approving a break-up fee equating to 2.5% of the cash purchase price, and expense reimbursement in an amount not exceeding $500,000).

52.     Approval of the Stalking Horse Bid Protections is appropriate under the circumstances. Courts in this circuit have stated that "bid procedures should provide a vehicle to enhance the bid." *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (citing *In re Food Barn Stores, Inc.*, 107 F.3d 558, (8th Cir. 1997) (discussing bid protections). Here, the Stalking Horse Bidder relied upon the agreement with the Debtor to seek the Stalking Horse Protections, and enabled the Debtor to obtain a DIP Facility on favorable terms when no other lending was available to sustain the Debtor's operations. The Stalking Horse Bid Protections are a normal and, indeed, necessary component of a sale outside the ordinary course. Such protections are material inducements to encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and participate in arms-length sale negotiations, despite the inherent risks of a chapter 11 process. *See, e.g., In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

53.     As illustrated above, the Stalking Horse protections are reasonable and typical in cases such as this one. Furthermore, the Stalking Horse Protections are fair, and reasonably

compensate the Stalking Horse Bidder for taking actions that will benefit the Debtor's estate, and should be approved for the following reasons.

54. First, the Stalking Horse Bid Protections are the product of good faith, arms-length negotiations between the Stalking Horse Bidder and the Debtor, which was acting in the interest of its estate consistent with its fiduciary duty. Sale Declaration ¶ 8.

55. Second, the Stalking Horse Bid Protections promote competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid for the Purchased Assets on which other bidders—and the Debtor—can rely. The Stalking Horse Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement and to provide the DIP Facility. Indeed, the Stalking Horse Agreement increases the likelihood that the price at which the Purchased Assets are sold will reflect their market value, and Stalking Horse Bidder is entitled to be compensated as a result. Sale Declaration ¶ 10.

56. Third, the Stalking Horse Bid Protections are reasonable relative to the proposed purchase price in view of the substantial benefits that the Debtor will receive from having the Stalking Horse Agreement serve as a floor for bidders that submit a bid for the Assets, which will confirm that the Debtor receives the highest or best offer for the Assets. The Break-Up Fee of 3.5% is within the range of what courts in this District have held as reasonable. Moreover, the Stalking Horse Agreement provides the Debtor with a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price. Accordingly, the Stalking Horse Bid Protections will not deter or chill bidding, are reasonable, and will enable the Debtor to maximize the value of the St. Louis Assets.

**C. Proposed Transaction Should Be Approved**

57.      Ample authority exists for approval of the sale proposed by this Motion. Section

363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing,

may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11

U.S.C. § 363(b)(1). Although section 363 does not specify a standard for determining when it is

appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely

authorize a sale of a debtor's assets if such sale is based upon the sound business judgment of the

debtor. *See, e.g., See, e.g. In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr.

E.D. Mo. September 15, 2022) [Docket No. 898]; *In re Channel One Comm., Inc.*, 117 B.R. 493,

496 (Bankr. E.D. Mo. 1990) (citing *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D.

Mo. 1993) (citing *In re George Walsh Chevrolet*, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990)); *see

also Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933

F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen

Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Trilogy Dev. Co., LLC*, 2010 Bankr.

LEXIS 5636, at *3-4 (Bankr. W.D. Mo. 2010).

58.      Courts typically consider the following factors in determining whether a proposed

sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether

adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale

will produce a fair and reasonable price for the property; and (iv) whether the parties have acted

in good faith. *See In re George Walsh Chevrolet*, 118 B.R. at 102; *In re The Landing*, 156 B.R. at

249*; In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20,

2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a

debtor demonstrates a valid business justification for a decision, it is presumed that "in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

**1.      Debtor Has Demonstrated a Sound Business Justification for the Proposed Transaction**

59.      A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing that paramount goal of any proposed sale of property of estate is to maximize value); *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc.,* 107 F.3d at 566 n.16 (emphasis original, internal alterations and quotations omitted)).

60.      As set forth above and in described in the Sale Declaration, a strong business justification exists for the sale of the Assets as described herein. An orderly but expeditious sale of the Assets is critical to preserving and realizing their going concern value and, in turn, to maximizing recoveries for the Debtor's economic stakeholders and preserving jobs. The marketing process undertaken pre-petition lead to the conclusion that a 363 sale is necessary for (i) the Debtor to raise capital so as to operate during the pendency of this case, and (ii) the Debtor to sell its assets on terms most favorable to the Debtor. After months of those processes, there has simply been no other option proposed to the Debtor that will enable them to reorganize, maintain their business as a going concern, and maximize recoveries to creditors. Those processes inform that without a 363 sale, the Debtor has a genuine risk of liquidating at distressed prices to the detriment of the Debtor,

its creditors, and other key stakeholders. Pursuing the sale of the Assets represents a reasonable exercise of the Debtor's business judgment and is in the best interests of all parties.

**2. Noticing Procedures are Reasonable and Appropriate.**

61. The notice to third parties that the Debtor proposes to provide, as set forth in the Bid Procedures Order and the Bid Procedures, is more than adequate and reasonable. Such notice will ensure that actual notice of the Auction, the Sale Hearing, and any Transaction will be provided to all known creditors of the Debtor. Such notice will enable the Court to make findings at the Sale Hearing and in the Sale Order that the ultimate purchaser of the Assets, whether it be the Stalking Horse Bidder or the Successful Bidder, shall not be liable under theories of successor liability in connection with such Assets.

**3. Proposed Transaction Will Produce a Fair and Reasonable Purchase Price for the St. Louis Assets.**

62. The Stalking Horse Bid is an offer to purchase the Assets for a price that the Debtor already has determined to be fair and reasonable, and which Midland States Bank, the Debtor's senior secured creditor, has approved. Given that the Stalking Horse Bid will serve as a floor for Qualified Bids for the Assets, the Debtor is confident that the sale process will culminate in the Debtor's obtaining the highest or best value for the Assets.

63. The Bid Procedures were carefully designed to facilitate a robust and competitive bidding process. The Debtor is poised to capitalize on the momentum from the prepetition phase of its sale process to maximize the value of the Assets. The Bid Procedures provide an appropriate framework for the Debtor to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtor's estate and its stakeholders. Transactions governed by the Bid Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or best value for the Assets,

which will inure to the benefit of all parties in interest in this chapter 11 case. The Debtor's compliance with the Bid Procedures Order and the Bid Procedures will provide the basis for a finding that the purchase price represents reasonably equivalent value and is fair and reasonable.

**4. Good Faith Purchaser Protections Are Appropriate.**

64. Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor even if approval of a sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states the following:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

65. Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one that purchases assets for value, in good faith, and without notice of adverse claims. *See In re Trism, Inc.*, 328 F.3d 1003, 1008 (8th Cir. 2003) ("Section 363(m) protects a good faith purchaser and lists no other exceptions or any other qualifications to receive the protection of section 363(m)."). Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp*., No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143, 147 (3d Cir. 1986)); *see also U.S. v. Whitney Design, Inc. (In re Whitney Design, Inc.)*, No. 4:10-CV-441, 2011 WL 13254299, at *2 (E.D. Mo. Jan. 11, 2011) (the purpose of Section 363 is to protect third party purchasers in good faith and "by providing reliability and finality, §363 enhances the value of the debtor's assets sold in bankruptcy").

66. The Debtor and the Stalking Horse Bidder have agreed to the Stalking Horse Bid Agreement without collusion, in good faith, and through extensive arms-length negotiations. To that end, the Stalking Horse Bidder and the Debtor engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Bid and the Stalking Horse Agreement, and in the sale process generally. To the best of the Debtor's knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Bid to be set aside under 363(m) of the Bankruptcy Code.

67. Further, and as set forth above, the Bid Procedures are designed to produce a fair and transparent competitive bidding process. The Stalking Horse Agreement was negotiated at arms-length and in good faith and any other stock/asset purchase agreement with a Successful Bidder executed by the Debtor will be negotiated at arms-length and in good faith. Accordingly, based upon the record to be made at the Sale Hearing, the Debtor will seek a finding that any Successful Bidder (including the Stalking Horse Bidder if named a Successful Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

**D.    Sale Free and Clear of Liens, Claims, Encumbrances, and Interests is Warranted.**

68. In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances to attach to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

(a) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b) such entity consents;

(c) such interest is a lien and the price at which property is to be sold is greater than the value of all liens on such property;

(d) such interest is in bona fide dispute; or

(e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *The Mutual Life Inc. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 857–858 (Bankr. W.D. Mo. 1984) (same); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

69. With respect to any party asserting a lien, claim, encumbrance or other interest against the Assets, the Debtor will be able to satisfy one or more of the conditions set forth in section 363(f).

70. It is also appropriate to sell the Assets free and clear of successor liability relating to the Debtor's business. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See e.g.*, *Cibulka* v. *Trans World Airlines, Inc.*, 92 F. App'x 366, 368 (8th Cir. 2004) (citing *In re Trans World Airlines, Inc.*, 322 F.3d 283, 28890 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under

travel voucher program)); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, Case No. 13-10334, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

**E. Assumption and Assignment of Proposed Assumed Contracts Should Be Approved.**

71. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See, e.g.*, *In re Market Square Inn.*, *Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also In re Noranda Aluminum, Inc.*, 549 B.R. 725, 727–28 (Bankr. E.D. Mo. 2016) (in the Eighth Circuit, the business judgment test "entails a determination that the transaction is in the best interest of the estate" (quoting *Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997)).

72.     The assumption and assignment of the Proposed Assumed Contracts in connection with a Transaction is an exercise of the Debtor's sound business judgment because a bidder may determine that such contracts are necessary to operate the Debtor's business, and as such, are essential to obtaining the highest or otherwise best offer for the Assets. Moreover, the Proposed Assumed Contracts will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bid Procedures Order, which will be reviewed by the Debtor's key stakeholders. Accordingly, the Debtor's assumption of Proposed Assumed Contracts is an exercise of sound business judgment and should be approved.

73.     The consummation of a Transaction, which will involve the assignment of the Proposed Assumed Contracts, will be contingent upon the Debtor's compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Proposed Assumed Contracts be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtor proposes to file with the Court and serve on each contract and lease Counterparty, the Assumption and Assignment Notice indicating the Debtor's calculation of the Cure Cost for each such contracts and leases. The Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Proposed Assumed Contracts to the Successful Bidder, including the proposed Cure Cost.

74.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See*

*Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 60506 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

75.     As set forth in the Bid Procedures, for a bid to qualify as a "Qualified Bid," a potential bidder must include with its bid Adequate Assurance Information. The Debtor will provide Adequate Assurance Information to all Counterparties to the Proposed Assumed Contracts and Counterparties will have an opportunity to file an Adequate Assurance Objection in advance of the Sale Hearing. Based on the foregoing, the Debtor's assumption and assignment of the Proposed Assumed Contracts, satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

76.     In addition, to facilitate the assumption and assignment of the Proposed Assumed Contracts, the Debtor further requests that the Court find that all anti-assignment provisions in the Proposed Assumed Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code. See 11 U.S.C § Section 365(f)(1).

**Waiver of Bankruptcy Rules 6004(a), (h), and 6006(d)**

77. To implement the foregoing successfully, the Debtor requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h) and 6006(d). Considering the Debtor's current financial condition, the Transaction(s) contemplated herein should be consummated as soon as practicable to allow the Debtor to maximize value for its estate and creditors, and to preserve as many jobs as possible for its hard-working employees. Accordingly, the Debtor represents that ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a), and the Debtor requests that the Bid Procedures Order, Sale Order and any order authorizing the assumption or assumption and assignment of a Proposed Assumed Contract in connection with a Transaction be effective immediately upon entry and that the fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived, to the extent such notice requirements and stay apply.

**Reservation of Rights**

78. Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtor, (ii) a waiver or limitation of the Debtor's or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable non-bankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (vi) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as

an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

**Notice**

79. Notice of this Motion will be provided to (i) the Office of the United States Trustee for the Eastern District of Missouri; (ii) the holders of the 20 largest unsecured claims against the Debtor; (iii) the Official Unsecured Creditors Committee and counsel; (iv) counsel for the Stalking Horse Bidder, Eric Peterson, Spencer Fane LLP, 1 N. Brentwood Boulevard, 12fth Floor, Saint Louis, Missouri 63105; (v) the Internal Revenue Service; (vi) the United States Attorney's Office for the Eastern District of Missouri; (vii) all persons and entities known by the Debtor to have expressed an interest in the Debtor in a transaction involving any material portion of the Assets during the past twelve months; and (viii) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "***Notice Parties***"). Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1.

**No Previous Request**

80. No previous request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, Debtor respectfully requests that the Court enter an Order granting the requested relief and granting such other and further relief as is necessary and appropriate in the circumstances.

Dated October 6, 2024

Respectfully submitted,

THE DESAI LAW FIRM, LLC

By: /s/ Spencer P. Desai

Spencer P. Desai, #39877
13321 North Outer Forty Road, Suite 300
St. Louis, MO 63017
Telephone: (314) 666-9781
Facsimile: (314) 448-4320
spd@desailawfirmllc.com

*COUNSEL FOR DEBTOR*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on the 6th day of October, 2024, that a true and correct copy of the above and foregoing pleading was served by electronic filing in the CM/ECF system of the United States Bankruptcy Court for the Eastern District of Missouri which will send notification of such filing to the registered parties in interest and by priority mail, postage pre-paid, to the following:

| | |
|---|---|
| Office of the United States Trustee<br>111South 10th Street, Room 6.353<br>St. Louis, Missouri 63102 | Joshua M. Jones<br>U.S. Attorney's Office<br>111 S. 10th Street, Suite 20.333<br>St. Louis, Missouri 63102 |
| Bruce D. LeMoine<br>Armstrong Teasdale<br>7700 Forsyth Boulevard<br>Suite 1800<br>St. Louis, Missouri 63105-1847 | Eric Peterson<br>Spencer Fane<br>1 North Brentwood Ave.<br>Clayton, MO 63105 |
| Nathan S. Puckett<br>Assistant City Counselor<br>1200 Market Street<br>City Hall, Room 314<br>St. Louis, MO 63103 | James W Byrne<br>3 Highland Place<br>Saint Louis, MO 63122 |
| Joseph B Basralian<br>& Daniele V Basralian<br>24 Fairfax Terrace<br>Chatham, NJ 07928 | Lester Nydegger<br>c/o Scott Moore<br>Lewis Rice<br>600 Washington Ave, 25FL<br>Saint Louis, MO 63101 |

| | |
|---|---|
| Robert E. Eggmann, Esq.<br>Thomas H. Riske, Esq.<br>Carmody MacDonald P.C.<br>120 South Central Avenue, Ste. 1800<br>St. Louis, Missouri 63105 | J. Talbot Sant, Jr.<br>640 Cepi Dr. Suite A<br>Chesterfield, MO 63005 |
| John J. Hall<br>Lewis Rice LLC<br>600 Washington Avenue, Suite 2500<br>St. Louis, Missouri 63101 | |

/s/ *Spencer P. Desai*