# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of January __, 2025 (the "***Effective Date***"), is entered into between URBAN CHESTNUT BREWING COMPANY, INC., a Missouri corporation ("***Seller***"), KEG HOLDINGS LLC, a Missouri limited liability company ("***Buyer***"), and David Wolfe, Florian Kuplent, and Jon Shine (individually, a "***Key Employee***" and collectively, the "***Key Employees***") (solely for purposes of <u>Article V</u>).

## RECITALS

WHEREAS, the Selling Parties (defined below) are engaged in the business of manufacturing and brewing alcohol and non-alcoholic beer, ale, and other intoxicating beverages by the package at wholesale and retail and operating full service restaurants and bars in the United States and Germany (the "***Business***"); and

WHEREAS, Seller has filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri (the "***Bankruptcy Court***") on September 6, 2024 (the "***Filing Date***" and such case being the "***Bankruptcy Case***");

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in, to, and under all of the tangible and intangible assets, properties, and rights of every kind and nature and wherever located (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "***Purchased Assets***"), including, without limitation, the following:

(a)    all cash and cash equivalents;

(b)    all accounts receivable held by Seller ("***Accounts Receivable***");

(c)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories ("***Inventory***");

(d)    all Contracts (the "***Assigned Contracts***") set forth on <u>Section 1.01(d)</u> of the disclosure schedules attached hereto (the "***Disclosure Schedules***"). The term "***Contracts***" means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral;

(e)    all Intellectual Property Assets and all Intellectual Property Registrations;

(f)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones, and other tangible personal property (the "***Tangible Personal Property***");

(g)    all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

(h)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums, and fees (including any such item relating to the payment of Taxes);

(i)    all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Purchased Assets;

(j)    copies of all books and records, including books of account, ledgers, and general, financial, and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records, and data (including all correspondence with any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction (collectively, "***Governmental Authority***")), sales material and records, strategic plans and marketing, and promotional surveys, material, and research ("***Books and Records***");

(k)    Seller's equity ownership in Urban Beverages LLC, a Missouri limited liability company. Seller, together with Urban Beverages LLC, shall be referred to as the "***Selling Parties***" and individually, a "***Selling Party***";

(l)    all goodwill and the going concern value of the Purchased Assets and the Business; and

(m)    all of Seller's right to use the name "Urban Chestnut," "Urban Chestnut Brewing Company," and any other trade names used by the Seller.

The Purchased Assets shall be transferred free and clear of all liens, claims, encumbrances, and interests to the maximum extent permitted by local, state, and federal law, including Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "***Bankruptcy Code***").

**Section 1.02    Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include the Purchase Price to be delivered to Seller in connection with any approved sale of the Purchased Assets; Seller's equity ownership in Urban Chestnut Brewing Company Deutschland GmbH; Seller's original books and records; Seller's interest in insurance policies or the proceeds thereof; and any claims or causes of action that may be asserted by or on behalf of Seller against any party, including, but not limited to, all claims or causes of action under the Bankruptcy Code; and any proceeds of the foregoing; and the assets, properties, and rights specifically set forth on <u>Section 1.02</u> of the Disclosure Schedules (collectively, the "***Excluded Assets***").

SL 6559395.12

**Section 1.03    Assumed Liabilities.**

(a)    Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller (collectively, the "***Assumed Liabilities***"), and no other Liabilities:

(i)    all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business, and do not relate to any failure to perform, improper performance, warranty, or other breach, default, or violation by Seller on or prior to the Closing; and

(ii)    those Liabilities of Seller set forth on Section 1.03(a)(iii) of the Disclosure Schedules.

For purposes of this Agreement, "***Liabilities***" means liabilities, obligations, or commitments of any nature whatsoever, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

(b)    Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "***Excluded Liabilities***"). Excluded Liabilities shall include, without limitation, all taxes, fees, fines, penalties, and other charges payable to any governmental unit or entity and all amounts owing to Midland States Bank, N.A., the U.S. Small Business Administration, or any other lender or financial institution.  For purposes of this Agreement: (i) "***Affiliate***" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (ii) the term "***control***" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

**Section 1.04    Purchase Price.** The aggregate purchase price for the Purchased Assets and satisfaction of the additional terms and provisions hereof shall be $2,550,000.00 (the "***Closing Cash***"), plus (i) the assumption of the Assumed Liabilities plus (ii) all principal, interest, fees and other amounts outstanding under any debtor-in-possession credit facility entered into between the parties hereto and approved by the Bankruptcy Court as of the Closing (the "***DIP Repayment***") (the Closing Cash and (i)-(ii) of the foregoing collectively being, the "***Purchase Price***"). Buyer shall pay the Purchase Price by wire transfers of the Closing Cash to Seller of immediately available funds in accordance with the wire transfer instructions set forth on Section 1.04 of the Disclosure Schedules and shall pay the DIP Repayment by wire transfer in accordance with the wire transfer instructions set forth on Section 1.04 of the Disclosure Schedules.

**Section 1.05    Allocation of Purchase Price.** The Purchase Price and the Assumed Liabilities shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule set forth on Section 1.05 of the Disclosure Schedules (the "***Allocation Schedule***"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller shall file all returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("***Tax Returns***") in a manner consistent with the Allocation Schedule.

3

**Section 1.06     Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 1.07     Third-Party Consents.** To the extent that each Selling Party's rights under any Purchased Asset may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and such Selling Party, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, each Selling Party, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

**ARTICLE II
CLOSING**

**Section 2.01     Stalking Horse Bid; Transaction Logistics.**

(a)     Buyer shall pay an earnest money deposit equal to ten percent (10%) of the Closing Cash (the "***Deposit***") into escrow with a mutually agreeable escrow agent ("***Escrow***"), within five (5) business days of the date this Agreement is approved by the Bankruptcy Court, which Deposit shall be applied to the Purchase Price at the Closing; provided that, if the Closing does not occur by the earlier of (i) ten (10) days from approval of Buyer's liquor licensing as determined by Buyer in its sole discretion or (ii) March 31, 2025 or otherwise by reason of Buyer's breach of this Agreement, then as Seller's sole remedy for such breach, the Deposit shall be non-refundable and will be retained by the bankruptcy estate of Seller as liquidated damages free of any claims by Buyer or any other person or entity with respect thereto.  Nothing herein shall alter, affect or impair Buyer's right of recovery of the Deposit in full or partial satisfaction of any debtor-in-possession financing ("***Buyer DIP Financing***") Buyer may provide to Seller in connection with proceedings under Title 11 of the United States Code ("***Bankruptcy Proceedings***").

(b)     Buyer shall deposit the remainder of the Closing Cash ("***Additional Deposit***") into Escrow upon the entry by the United States Bankruptcy Court for the Eastern District of Missouri ("***Court***" or "***Bankruptcy Court***") a final, nonappealable order approving the written Agreement, which shall be entered not later than January 27, 2025, or at such later date if agreed by Buyer and Seller. Such Additional Deposit shall be returned to Buyer upon the earlier to occur of March 31, 2025 or Bankruptcy Court approval of the sale of some or all of the Purchased Assets to a Prevailing Bidder, together with the Deposit.

(c)     Buyer shall serve as the sole stalking horse bidder for the Purchased Assets at the Purchase Price, pursuant to such bidding procedures as are approved by Buyer and by a final, non-appealable order of the Bankruptcy Court.  Such bidding procedures shall include, among other things, the requirements that any competing bid must have a cash purchase price equal to or greater than the sum of (1) the Closing Cash, plus (2) all principal, interest, fees, and other charges then-outstanding pursuant to any Buyer DIP Financing provided by Buyer in connection with Seller's Bankruptcy Proceedings; plus (3) a break-up fee in the amount of $85,000.00 (the "***Break-Up Fee***"), plus (4) an initial overbid increment of $100,000.00.  In the event that prior to Closing (i) an auction for the Purchased Assets is held pursuant to bidding procedures approved by the

4

Bankruptcy Court, (ii) Seller receives a bona fide, qualified over-bid pursuant to such bidding procedures, (iii) the Bankruptcy Court approves a sale of the Purchased Assets to another bidder (the "***Prevailing Bidder***"), and (iv) the sale of the Purchased Assets to the Prevailing Bidder timely closes, then, in addition to any other termination provisions set forth in this Agreement, this Agreement shall be deemed cancelled upon Bankruptcy Court approval of a sale to such Prevailing Bidder.  In the event of such cancellation, Seller shall promptly return or release the Deposit and Additional Deposit to Buyer and upon Closing with the Prevailing Bidder, shall pay the Break-Up Fee to Buyer from the proceeds of the sale of the Purchased Assets to the Prevailing Bidder; shall repay any outstanding Buyer DIP Financing in full; and thereafter neither Seller nor Buyer shall have any further liabilities or obligations under this Agreement or the transactions contemplated hereby.  In addition to the foregoing, the Deposit and Additional Deposit shall be fully refundable to Buyer in the event the Closing does not timely occur by March 31, 2025 for any reason other than a breach of the Agreement by Buyer.

(d)      Buyer shall have a period commencing on the Filing Date through the last date on which qualified bidders may submit overbids for the purchase of the Purchased Assets pursuant to bidding procedures approved by the Bankruptcy Court (the "***Review Period***") to conduct examinations or inspections of the Business and to review such information related to the Business as Buyer may desire to review.  In the event that Buyer is not satisfied with the results of such examinations or inspections (as determined by Buyer in its reasonable discretion), Buyer may terminate this Agreement by delivering written notice to Seller on or before the expiration of the Review Period, in which case Seller shall promptly return or release the Deposit to Buyer and neither Seller nor Buyer shall have any further liabilities or obligations under this Agreement or the transactions contemplated hereby.

(e)      Upon occurrence of the Closing, the balance of the Purchase Price, if any, after application of the Deposit, Additional Deposit, and seventy-five percent (75%) of the aggregate of all adequate protection payments made by Seller under any debtor-in-possession financing facility funded by Buyer shall be paid to the bankruptcy estate of Seller in accordance with applicable laws, rules and regulations and any order or directive of the Bankruptcy Court.  Delivery of the Purchased Assets shall be made by Seller to Buyer at the Closing by delivering such special warranty deeds, bills of sale, assignments and other instruments of conveyance and transfer as are reasonably necessary to vest in Buyer title to, and the right to full custody and control of, the Purchased Assets in accordance with the provisions of this Agreement and any orders of the Bankruptcy Court approving the transactions contemplated herein.  At Closing, Seller shall surrender possession of the Purchased Assets to Buyer, and Buyer shall assume ownership of the Purchased Assets.

(f)      The closing of the transaction contemplated in this Agreement (the "***Closing***" and the date being the "***Closing Date***")) shall occur within ten (10) business days after the later to occur of (i) award to Buyer of all necessary Federal, State and Local licenses governing the manufacture and sale of alcoholic beverages and (ii) approval of the Bankruptcy Court to proceed with Closing under this Agreement, but, upon the written consent of Buyer, may be extended if necessary to receive approval   from any Person whose consent is required for Closing to own and operate the Business, in which case the Closing hereunder will occur within ten (10) business days after obtaining such approval(s).  Seller and Buyer agree to use good faith efforts to seek the approvals of the Bankruptcy Court and such Person(s) to proceed with Closing under this Agreement.

**Section 2.02    Closing Deliverables.**

(a)      At the Closing, Seller shall deliver to Buyer the following:

SL 6559395.12

(i)      a bill of sale in form and substance satisfactory to Buyer (the "***Bill of Sale***") and duly executed by Seller, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(ii)      an assignment and assumption agreement in form and substance satisfactory to Buyer (the "***Assignment and Assumption Agreement***") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)      intellectual property assignment agreements, in forms and substance satisfactory to Buyer (the "***IP Assignment***") and duly executed by each Selling Party and Florian Kuplent, effecting the assignment to and assumption by Buyer of the Intellectual Property Assets by the applicable Selling Party and of all intellectual property owned or held for use by the Business by Florian Kuplent;

(iv)      tax clearance certificates from the taxing authorities in the jurisdictions that impose Taxes on Seller or where Seller has a duty to file Tax Returns in connection with the transactions contemplated by this Agreement and evidence of the payment in full or other satisfaction of any Taxes owed by Seller in those jurisdictions;

(v)      a certificate of the Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the board of directors and the shareholders of Seller, which authorize the execution, delivery, and performance of this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the IP Assignment, and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "***Transaction Documents***") and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the other Transaction Documents;

(vi)      such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement;

(vii)      approval of the Bankruptcy Court of this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby;

(viii)      employment agreements for the Key Employees, duly executed by each Key Employee (the "***Employment Agreements***");

(ix)      a final order from the Bankruptcy Court ordering the Seller to transfer all of the Purchased Assets free and clear of all Encumbrances and rights of redemption and free of successor liability of any kind (except the Assumed Liabilities); and

(x)      such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)      At the Closing, Buyer shall deliver to Seller the following:

(i)      the Purchase Price (less seventy-five percent (75%) of the aggregate of all adequate protection payments made by Seller under any debtor-in-possession financing

6

facility funded by Buyer and less any amounts which may be withheld for outstanding Tax Liabilities);

      (ii)      the Assignment and Assumption Agreement, duly executed by Buyer;

      (iii)      the IP Assignment, duly executed by Buyer;

      (iv)      a certificate of the Secretary (or equivalent officer) of Buyer certifying as to (A) the resolutions of the board of directors of Buyer, which authorize the execution, delivery, and performance of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Buyer authorized to sign this Agreement and the other Transaction Documents; and

      (v)      the Employment Agreements, duly executed by Buyer; and

      (vi)      such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLING PARTIES

The Selling Parties represent and warrant to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01    Organization and Authority of Each Selling Party.** Subject to the jurisdiction of the Bankruptcy Court, each Selling Party is duly organized, validly existing, and in good standing under the Laws of the jurisdiction of its formation and has full corporate and/or limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which each Selling Party is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each Selling Party of this Agreement and any other Transaction Document to which each Selling Party a party, the performance by each Selling Party of its obligations hereunder and thereunder, and the consummation by each Selling Party of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate or limited liability company, board, and shareholder or equity owner action on the part of each Selling Party. Subject to the approval of the Bankruptcy Court, this Agreement and the Transaction Documents constitute legal, valid, and binding obligations of each Selling Party enforceable against such Selling Party in accordance with their respective terms.

**Section 3.02    No Conflicts or Consents.** Except as related to, or as a result of, the filing or pendency of the Bankruptcy Case, and assuming that requisite Bankruptcy Court approvals are obtained, the execution, delivery, and performance by each Selling Party of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of each Selling Party; (b) except for the approval of the Bankruptcy Court, violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, "*Law*") or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority ("***Governmental Order***") applicable to each Selling Party, the Business, or the Purchased Assets; (c) except for the approval of the Bankruptcy Court,

7

require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity ("***Person***") or require any permit, license, or Governmental Order; (d) except as set forth on Section 3.02 of the Disclosure Schedules, violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel any Contract to which each Selling Party is a party or by which such Selling Party or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("***Encumbrance***") on the Purchased Assets.

Section 3.03    **Financial Statements.**  Complete copies of the financial statements consisting of the balance sheet of the Business as of the fiscal years ended December 31, 2022 and December 31, 2023, as well as year-to-date through June 30, 2024, and the related statements of income and retained earnings, shareholders' equity, and cash flow for the periods then ended (the "***Financial Statements***") have been delivered to Buyer. Except as set forth on Section 3.03 of the Disclosure Schedules, the Financial Statements have been prepared in accordance with generally accepted accounting principles in effect in the United States from time to time, applied on a consistent basis throughout the period involved. The Financial Statements fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated. The balance sheet of the Business as of December 31, 2023 is referred to herein as the "***Balance Sheet***" and the date thereof as the "***Balance Sheet Date***" and the balance sheet of the Business as of June 30, 2024 is referred to herein as the "***Interim Balance Sheet***" and the date thereof as the "***Interim Balance Sheet Date***".

Section 3.04    **Undisclosed Liabilities.** Each Selling Party has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in each Selling Party's balance sheets as of the Balance Sheet Date, (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount, (c) arising from the commencement of the Bankruptcy Case (which Liabilities are set forth on Section 3.04 of the Disclosure Schedules), or (d) those which are Excluded Liabilities.

Section 3.05    **Absence of Certain Changes, Events, and Conditions.**  Since the Balance Sheet Date, except for the Bankruptcy Case, and the changes, events, conditions and developments giving rise to, and resulting from, the Bankruptcy Case,  or except as set forth on Section 3.05 of the Disclosure Schedules, the Business has been conducted in the ordinary course of business consistent with past practice and there has not been any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to: (a) the business, results of operations, condition (financial or otherwise), or assets of the Business; or (b) the value of the Purchased Assets.

Section 3.06    **Assigned Contracts.**  Each Assigned Contract is valid and binding on the applicable Selling Party in accordance with its terms and is in full force and effect. Except for any breach caused by Seller's filing for Chapter 11 bankruptcy, and the Bankruptcy Case, none of the Selling Parties nor, to their knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Assigned Contract. Except for any breach caused by Seller's filing of the Chapter 11 bankruptcy petition, and the Bankruptcy Case, no event or circumstance has occurred that would constitute an event of default under any Assigned Contract or result in a termination thereof. Complete and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Assigned Contract.

SL 6559395.12

**Section 3.07    Title to Purchased Assets.** Each Selling Party has good and valid title to all the Purchased Assets, free and clear of Encumbrances except those of public record.

**Section 3.08    Condition and Sufficiency of Assets.** The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property included in the Purchased Assets and those owned by the Selling Parties are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs. The Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted. None of the Excluded Assets are material to the Business.

**Section 3.09    Inventory.** All Inventory, whether or not reflected in each Selling Party's balance sheets, consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. All Inventory is owned by the applicable Selling Party free and clear of all Encumbrances, and no Inventory is held on a consignment basis. The quantities of each item of Inventory (whether raw materials, work-in-process or finished goods) are not excessive, but are reasonable in the present circumstances of each Selling Party.

**Section 3.10    Intellectual Property.**

(a)    Section 3.10(a) of the Disclosure Schedules contains a correct, current and complete list of: (i) all Intellectual Property Registrations, specifying as to each, as applicable: the title, mark, or design; the jurisdiction by or in which it has been issued, registered or filed; the patent, registration or application serial number; the issue, registration or filing date; and the current status; (ii) all unregistered trademarks included in the Intellectual Property Assets; and (ii) all other Intellectual Property Assets that are used or held for use in the conduct of the Business as currently conducted. As used in this Agreement, "***Intellectual Property Registrations***" means all Intellectual Property Assets that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued patents, registered trademarks, domain names and copyrights, and pending applications for any of the foregoing. "***Intellectual Property Assets***" means all Intellectual Property that is owned by each Selling Party and used or held for use in the conduct of the Business as currently conducted (including, for the avoidance of doubt, intellectual property not yet deployed and products and services that have not yet been brought to market by the Business), together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to each Selling Party with respect to such Intellectual Property; and (ii) claims and causes of action with respect to such Intellectual Property, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for infringement, misappropriation, or other violation thereof. "***Intellectual Property***" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("***Patents***"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals

9

of, any of the foregoing ("**Trademarks**"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**"); (d) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein ("**Trade Secrets**"); (f) rights of publicity; and (g) all other intellectual or industrial property and proprietary rights.

(b)    Section 3.10(b) of the Disclosure Schedules contains a correct, current and complete list of all Intellectual Property Agreements, specifying for each the date, title, and parties thereto, and separately identifying the Intellectual Property Agreements: (i) under which each Selling Party is a licensor or otherwise grants to any Person any right or interest relating to any Intellectual Property Asset; (ii) under which each Selling Party is a licensee or otherwise granted any right or interest relating to the Intellectual Property of any Person; and (iii) which otherwise relate to the each Selling Party's ownership or use of any Intellectual Property in the conduct of the Business as currently conducted, in each case identifying the Intellectual Property covered by such Intellectual Property Agreement.  Each Selling Party has provided Buyer with true and complete copies (or in the case of any oral agreements, a complete and correct written description) of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each Intellectual Property Agreement is valid and binding on any Selling Party in accordance with its terms and is in full force and effect. No Selling Party nor any other party thereto is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal), any Intellectual Property Agreement.  As used in this Agreement, "**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to any Intellectual Property that is used or held for use in the conduct of the Business as currently conducted to which each Selling Party is a party, beneficiary or otherwise bound.

(c)    Each Selling Party is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owner of all right, title and interest in and to the Intellectual Property Assets, and has the valid and enforceable right to use all other Intellectual Property used or held for use in or necessary for the conduct of the Business as currently conducted, in each case, free and clear of Encumbrances. The Intellectual Property Assets and Licensed Intellectual Property are all of the Intellectual Property necessary to operate the Business as presently conducted. Each Selling Party has entered into binding, valid and enforceable written Contracts with each current and former employee and independent contractor who is or was involved in or has contributed to the invention, creation, or development of any Intellectual Property during the course of employment or engagement with such Selling Party whereby such employee or independent contractor (i) acknowledges such Selling Party's exclusive ownership of all Intellectual Property Assets invented, created or developed by such employee or independent contractor within the scope of his or her employment or engagement with such Selling Party; (ii) grants to such Selling Party a present, irrevocable assignment of any ownership interest such employee or independent contractor may have in or to such Intellectual Property, to the extent such Intellectual Property does not constitute a "work made for hire" under applicable Law; and (iii) irrevocably waives any right or interest, including any moral rights, regarding such Intellectual Property, to the extent permitted by applicable Law.  All assignments and other instruments necessary to establish, record, and perfect each Selling Party ownership interest in the Intellectual

SL 6559395.12

Property Registrations have been validly executed, delivered, and filed with the relevant Governmental Authorities and authorized registrars.  As used in this Agreement, "*Licensed Intellectual Property*" means all Intellectual Property in which each Selling Party holds any rights or interests granted by other Persons that is used or held for use in the conduct of the Business as currently conducted.

(d)     Neither the execution, delivery, or performance of this Agreement, nor the consummation of the transactions contemplated hereunder, will result in the loss or impairment of or payment of any additional amounts with respect to, or require the consent of any other Person in respect of, the Buyer's right to own or use any Intellectual Property Assets or Licensed Intellectual Property in the conduct of the Business as currently conducted. Immediately following the Closing, all Intellectual Property Assets will be owned or available for use by Buyer on substantially the same terms as they were owned or available for use by the Selling Parties immediately prior to the Closing.

(e)     All of the Intellectual Property Assets and Licensed Intellectual Property are valid and enforceable, and all Intellectual Property Registrations are subsisting and in full force and effect. Each Selling Party has taken all necessary steps to maintain and enforce the Intellectual Property Assets and Licensed Intellectual Property and to preserve the confidentiality of all Trade Secrets included in the Intellectual Property Assets, including by requiring all Persons having access thereto to execute binding, written non-disclosure agreements. All required filings and fees related to the Intellectual Property Registrations have been timely submitted with and paid to the relevant Governmental Authorities and authorized registrars. The Selling Parties have provided Buyer with true and complete copies of all file histories, documents, certificates, office actions, correspondence, assignments, and other instruments relating to the Intellectual Property Registrations.

(f)     The conduct of the Business as currently and formerly conducted, including the use of the Intellectual Property Assets and Licensed Intellectual Property in connection therewith, and the products, processes, and services of the Business have not infringed, misappropriated, or otherwise violated and will not infringe, misappropriate, or otherwise violate the Intellectual Property or other rights of any Person. No Person has infringed, misappropriated, or otherwise violated any Intellectual Property Assets or Licensed Intellectual Property.

(g)     There are no Actions (including any opposition, cancellation, revocation, review, or other proceeding), whether settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, or other violation of the Intellectual Property of any Person by any Selling Party in the conduct of the Business; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Intellectual Property Assets or Licensed Intellectual Property; or (iii) by any Selling Party or any other Person alleging any infringement, misappropriation, or other violation by any Person of any Intellectual Property Assets. No Selling Party is aware of any facts or circumstances that could reasonably be expected to give rise to any such Action. No Selling Party is subject to any outstanding or prospective Governmental Order (including any motion or petition therefor) that does or could reasonably be expected to restrict or impair the use of any Intellectual Property Assets or Licensed Intellectual Property.

(h)     Each Selling Party has complied with all applicable Laws and all internal or publicly posted policies, notices, and statements concerning the collection, use, processing, storage, transfer, and security of personal information in the conduct of the Business. No Selling Party has (i) experienced any actual, alleged, or suspected data breach or other security incident involving

SL 6559395.12

personal information in its possession or control nor (ii) been subject to or received any written notice of any audit, investigation, complaint, or other Action by any Governmental Authority or other Person concerning the Company's collection, use, processing, storage, transfer, or protection of personal information or actual, alleged, or suspected violation of any applicable Law concerning privacy, data security, or data breach notification, in each case in connection with the conduct of the Business, and to each Selling Party's knowledge, there are no facts or circumstances that could reasonably be expected to give rise to any such Action.

**Section 3.11    Material Customers and Suppliers.**

(a)    Section 3.11(a) of the Disclosure Schedules sets forth with respect to the Business (i) its top 10 customers for each Selling Party, along with aggregate consideration paid to each Selling Party for goods or services rendered, for each of the two (2) most recent fiscal years (collectively, the "***Material Customers***"); and (ii) the amount of consideration paid by each Material Customer during such periods. No Selling Party has received any notice that any of the Material Customers has ceased, or intends to cease after the Closing, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business.

(b)    Section 3.11(b) of the Disclosure Schedules sets forth with respect to the Business (i) its top 10 suppliers for each Selling Party, along with aggregate consideration paid by each Selling Party for goods or services rendered, for each of the two (2) most recent fiscal years (collectively, the "***Material Suppliers***"); and (ii) the amount of purchases from each Material Supplier during such periods. No Selling Party has received any notice that any of the Material Suppliers has ceased, or intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

**Section 3.12    Legal Proceedings; Governmental Orders.**

(a)    Except as set forth on Section 3.12(a) of the Disclosure Schedules, there are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "***Actions***") pending or, to each Selling Party's knowledge, threatened against or by any Selling Party: (i) relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement.

(b)    There are no outstanding Governmental Orders against, relating to, or affecting the Business or the Purchased Assets.

**Section 3.13    Compliance with Laws; Permits.**

(a)    Each Selling Party is in material compliance with all Laws applicable to such party's conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

(b)    All permits required for each Selling Party to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by such Selling Party and are valid and in full force and effect. All fees and charges with respect to such permits as of the date hereof have been paid in full. Each Selling Party has complied and is now materially complying with the terms of its permits. No event has occurred that, with or without notice or lapse

of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of such permits.

**Section 3.14    Taxes.** All Taxes due and owing by each Selling Party have been, or will be, timely paid. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of each Selling Party. All Tax Returns required to be filed by each Selling Party for any tax periods prior to Closing have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete, and correct in all respects. The term "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, withholding, payroll, employment, unemployment, excise, severance, stamp, occupation, premium, property (real or personal), customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto.

**Section 3.15    Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of any Selling Party.

**Section 3.16    Full Disclosure.** No representation or warranty by any Selling Party in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, true.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date hereof.

**Section 4.01    Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Missouri. Buyer has full limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02    No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other organizational documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 4.03    Brokers.** Except for Nolan & Associates, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions

SL 6559395.12

contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 4.04    Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

## ARTICLE V
## COVENANTS

**Section 5.01    Confidentiality.** After the Closing, each Selling Party and each Key Employee shall, and shall cause each of their Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("***Representatives***") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that each Selling Party can show that such information: (a) is generally available to and known by the public through no fault of such Selling Party, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by such Selling Party, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If any Selling Party or any of its Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or Law, such Selling Party shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* such Selling Party shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.02    Non-Competition; Non-Solicitation.**

(a)    The Selling Parties acknowledge the competitive nature of the Business and accordingly agree, in connection with the sale of the Purchased Assets, including the goodwill of the Business, which Buyer considers to be a valuable asset, and in exchange for good and valuable consideration, that for a period of five (5) years commencing on the Closing Date (the "***Restricted Period***"), each Selling Party shall not, and shall not permit any of its subsidiaries (if any) to, directly or indirectly, (i) engage in or assist others in engaging in the Business (the "***Restricted Business***") in the United States (the "***Territory***"); (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, director, member, manager, employee, principal, agent, trustee, or consultant; or (iii) cause, induce, or encourage any material actual or prospective client, customer, supplier, or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own five percent (5%) or more of any class of securities of such Person. Notwithstanding anything herein to the contrary, the Restricted Period, Territory, and Restricted Business as it applies to each Employee shall be as set forth in each respective Employment Agreement of each Key Employee.

(b)    During the Restricted Period, each Selling Party shall not, and shall not permit any of the subsidiaries (if any) to, directly or indirectly, hire or solicit any person who is or was

14

employed in the Business during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided that* nothing in this Section 5.02(b) shall prevent Seller or any of its subsidiaries from hiring (i) any employee whose employment has been terminated by Buyer; or (ii) after one hundred eighty (180) days from the date of termination of employment, any employee whose employment has been terminated by the employee. For the avoidance of doubt, the Restricted Period as it applies to each Employee shall be as set forth in each respective Employment Agreement of each Key Employee.

(c)    Each Selling Party and each Key Employee acknowledges that a breach or threatened breach of this Section 5.02 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond), provided that, with respect the Key Employees, Buyer's remedies shall solely be as set forth in the Key Employees' respective Employment Agreements.

(d)    Each Selling Party acknowledges that the restrictions contained in this Section 5.02, and each Key Employee acknowledges that the restrictive covenants contained in their respective Employment Agreements,  are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 5.02 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction or any Governmental Order, then any court is expressly empowered to reform such covenant in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law or such Governmental Order. The covenants contained in this Section 5.02 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 5.03    No Encumbrances.**  Seller hereby covenants and agrees that, except as consented to by Buyer, from and after the date of this Agreement and until the Closing, Seller shall not (i) mortgage, pledge, or subject to any lien, charge or encumbrance of any of the Purchased Assets, except as may be ordered otherwise by the Bankruptcy Court, and in such event, upon express acceptance and approval by Buyer of any such court-ordered lien, charge or encumbrance; (ii) enter into any leases affecting all or any portion of the Purchased Assets; or (iii) enter into any service, supply, maintenance or other contracts pertaining to the Purchased Assets or the operation of the Purchased Assets which are not cancelable without penalty at Closing.

**Section 5.04    Public Announcements.** Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.05    Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar Laws of any jurisdiction that may otherwise be applicable with respect

SL 6559395.12

to the sale of any or all of the Purchased Assets to Buyer. Any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sales, bulk transfer, or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

**Section 5.06    Transfer Taxes.** All sales, use, registration, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents, if any, shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 5.07    Closing Date Financial Statements.** No later than 10 business days following the Closing Date, each Selling Party shall deliver to Buyer complete copies of the financial statements consisting of the balance sheet of the Business as of the Closing Date, and the related statement of income and retained earnings, shareholders' equity, and cash flow for the period then ended.

**Section 5.08    Post-Closing Name Change.** After the Closing, no Selling Party shall use the name "Urban Chestnut" or "Urban Chestnut Brewing Company", or any similar name. At the Closing, Seller shall deliver to Buyer an executed amendment to its articles of incorporation changing its name to a name distinctly different from "Urban Chestnut Brewing Company, Inc." and provide Buyer with a copy of the filed amendments upon Seller's receipt thereof.

**Section 5.09    Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**ARTICLE VI**
**INDEMNIFICATION**

**Section 6.01    Survival.** All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 6.02    Indemnification by Seller.** Subject to the other terms and conditions of this ARTICLE VI, from and after Closing, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "***Buyer Indemnitees***") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees (collectively, "***Losses***"), incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, or with respect to any claim arising from facts or circumstances occurring in whole or in part from and after September 6, 2024, and any claim that is not otherwise administered by the Bankruptcy Court by reason of Seller's failure to provide the claimant effective notice of the Bankruptcy Case.

**Section 6.03    Omitted**.

**Section 6.04    Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "***Indemnified Party***") shall promptly provide written notice of such claim to the other party (the "***Indemnifying Party***"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the

16

Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 6.05    Cumulative Remedies.** The rights and remedies provided in this ARTICLE VI are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**ARTICLE VII**
**TERMINATION**

**Section 7.01    Termination of Agreement**.  In addition to Buyer's termination rights set forth in Section 2.01, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to Closing:

(a)    by the mutual written consent of Buyer and Seller;

(b)    on March 31, 2025 unless in advance of such date Buyer shall have received all Federal, State and Local licenses governing the manufacture and sale of alcoholic beverages as may be necessary or appropriate to maintain and continue the uninterrupted business operations in which the Debtor is engaged as of the date hereof;

(c)    by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable;

(d)    by Buyer by written notice to Seller if:

(i)    Seller fails to obtain and deliver to Buyer not later than November 10, 2024 a first interim order of the Bankruptcy Court approving Buyer DIP Financing in a form and manner acceptable to Buyer;

(ii)    Seller fails to obtain and deliver to Buyer not later than December 6, 2024 a final, non-appealable order approving the Buyer DIP Financing and DIP Credit Agreement in a form and manner acceptable to Buyer;

(iii)    Seller fails to obtain and deliver to Buyer not later than November 10, 2024, an order of the Bankruptcy Court approving Bid Procedures in a form and manner acceptable to Buyer;

(iv)    Seller fails to adhere to any budget in connection with any Buyer DIP Financing or DIP Credit Agreement, or defaults on any provision thereof;

SL 6559395.12

(v)       Together with the dates and deadlines referenced in <u>Section 2.01 (a)-(b)</u>, the foregoing provisions of this <u>Section 7.01(i)-(iv)</u> are defined collectively in this Agreement as the "***Transaction Milestones***";

(e)       Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by any Selling Party pursuant to this Agreement or any Buyer DIP Financing, and such breach, inaccuracy or failure has not been cured by such Selling Party within 10 days of such Selling Party's receipt of written notice of such breach from Buyer;

(f)       Buyer is not then in material breach of any provision of this Agreement and, during the Review Period, there has been any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to: (a) the business, results of operations, condition (financial or otherwise), or assets of any Selling Party; or (b) the value of the Purchased Assets;

(g)       by Buyer if an "Event of Default" or "Default" is declared by the applicable administrative agent or lender(s) under the Buyer DIP Financing or those certain Loan Agreement or Promissory Note entered into by and between the parties hereto as of even date herewith; or

(h)       automatically and without action by either party:

(i)       upon approval by the Bankruptcy Court of a sale of the Business to the Prevailing Bidder, which bidder is not Buyer, unless Buyer is designated a "backup bidder" by the Bankruptcy Court; or

(ii)       upon the consummation of the sale of the Business to the Prevailing Bidder, which bidder is not Buyer.

(i)       Notwithstanding the foregoing provisions of this <u>Section 7.01</u>, the termination of this Agreement shall not alter, impair, or affect the rights of Buyer to recover the Break-Up Fee, all principal, interest, fees, or other charges approved in connection with any Buyer DIP Financing or DIP Credit Agreement, all of which shall survive termination and are hereby expressly preserved.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01      Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 8.02      Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 8.02</u>):

SL 6559395.12

| **If to Seller:** | URBAN CHESTNUT BREWING COMPANY, INC., |
|---|---|
| | 4465 Manchester Avenue, St. Louis, MO 63110<br>Email: david@urbanchestnut.com<br>Attention: David Wolfe, President |
| with a copy to: | Sandberg Phoenix, P.C.<br>701 Market St, Suite 600, St. Louis, MO 63101<br>Email: bpatel@sandbergphoenix.com; jatwood@sandbergphoenix.com<br>Attention: Bhavik Patel; Riley Atwood |
| **If to Buyer:** | Keg Holdings LLC<br>Email: btravers45@gmail.com<br>Attention: Brian Travers, Manager |
| with a copy to: | Spencer Fane LLP<br>1 N. Brentwood Blvd, Suite 1200<br>St. Louis, Missouri 63105<br>Email: jfigge@spencerfane.com; sseabaugh@spencerfane.com<br>Attention: Jeff Figge; Scot Seabaugh |

**Section 8.03    Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 8.04    Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 8.05    Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits, and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 8.06    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 8.07    Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

SL 6559395.12

**Section 8.08    Governing Law; Submission to Jurisdiction.** All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of Missouri without giving effect to any choice or conflict of law provision or rule (whether of the State of Missouri or any other jurisdiction Any and all disputes concerning the interpretation, consummation, and/or enforcement of this Agreement shall be in the exclusive jurisdiction of the Bankruptcy Court, and each party irrevocably submits to the exclusive jurisdiction of such court in any such suit, action, proceeding, or dispute.

**Section 8.09    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signatures on the following page.]

SL 6559395.12

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

SELLER:                                              BUYER:

Urban Chestnut Brewing Company, Inc.                 Keg Holdings LLC

                                                     *Brian Travers*

_____                    _____
David Wolfe, Authorized Signatory                    Brian Travers, Manager


                                                     SELLING PARTIES:


                                                     Urban Beverages, LLC




                                                     _____
                                                     David Wolfe, Authorized Signatory



                                                     KEY EMPLOYEES:



                                                     _____
                                                     David Wolfe



                                                     _____
                                                     Jon Shine